[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-11179

_____

D.C. Docket No. 4:09-cv-00251-KOB-TMP

MICHAEL SHANNON TAYLOR,

Petitioner - Appellant,

versus

GRANTT CULLIVER,
Superintendent, Holman Correctional Facility,
ATTORNEY GENERAL, STATE OF ALABAMA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(August 6, 2015)

Before TJOFLAT, MARTIN and JORDAN, Circuit Judges.

PER CURIAM:

Michael Shannon Taylor, an Alabama inmate sentenced to death for the 1991 murders of Ivan Moore and his wife Lucille Moore, appeals the district court's denial of his petition for a writ of habeas corpus. *See* 28 U.S.C. § 2254. We granted Mr. Taylor a certificate of appealability as to the following issues:

> (1)    Whether    trial    counsel    rendered    ineffective assistance during the investigatory, guilt, and penalty phases of Mr. Taylor's capital case.
>
> (2)    Whether the state trial court denied Mr. Taylor due process when it refused to instruct the jury on the lesser-included offense of felony murder.
>
> (3)    Whether the prosecution, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny, struck a prospective juror on the basis of race.

Having considered the state court record, the district court's thorough order, and the parties' submissions, and with the benefit of oral argument, we affirm the district court's denial of habeas relief.

## I

On direct appeal, the Supreme Court of Alabama described the circumstances surrounding the Moores' murders as follows:

> On November 4, 1991, Taylor, then a 19–year–old high school graduate who had returned to his hometown of Gadsden while absent without leave from the Navy, solicited a ride to the home of the Moores, an elderly couple he knew. Taylor left a duffel bag outside the house and asked Mr. Moore, who was age 83, if he could use the telephone. Once inside, Taylor pretended to make a telephone call, and then Mr. Moore asked him if

2

he would like something to drink.  Taylor said he would, and Mr. Moore got him a glass of water and a doughnut.  After Taylor had eaten, Mr. Moore asked him if he would like something else.  Taylor said he would, and Mr. Moore went back into the kitchen.

Taylor then went outside and removed a metal bar from his duffel bag.  Taylor followed Mr. Moore into the kitchen, and, as the man bent into the refrigerator, Taylor began to strike him about the head with the metal bar.  Mr. Moore fell to the floor.  Mrs. Moore, who was age 79, entered the kitchen and bent down to see what was wrong with her husband.  Taylor then struck her repeatedly about the head with the metal bar.  As Mr. Moore attempted to crawl away and get up, Taylor again struck him with the bar.  Taylor then took Mr. Moore's wallet, Mrs. Moore's purse, their checkbook, and their 1986 Cadillac automobile.  He drove to Birmingham, cashed several checks made out to his name for a total of about $1500, and made several clothing and jewelry purchases at the Galleria shopping mall.

The Moores were discovered in their home by a neighbor two days after their beating.  Mr. Moore was dead at that time; Mrs. Moore was then unconscious, but later died.  The cause of both their deaths was severe blunt force injuries to their heads, which had fractured their skulls.  Mr. Moore had been struck with the bar approximately 17 times and had 11 wounds on his head; Mrs. Moore had been struck with the bar at least 10 times.

Taylor was arrested outside the Galleria shopping mall, after he had entered the Moores' vehicle and attempted to drive away.  Upon being returned to Gadsden, Taylor confessed to beating the Moores during the course of a robbery.  It is disputed whether he stated, while giving his confession, that he had intended to kill the Moores.

3

*Ex parte Taylor*, 666 So. 2d 73, 75-76 (Ala. 1995) (*Taylor II*).

The state charged Mr. Taylor by indictment with two counts of murder committed during a robbery in the first degree under Ala. Code § 13A-5-40(a)(2), and one count of murder of two or more persons during one act or course of conduct under Ala. Code § 13A-5-40(a)(10). A jury convicted him of all three charges on April 14, 1993. Following a penalty hearing, that same jury unanimously recommended a sentence of death.

On May 5, 1993, the trial court sentenced Mr. Taylor to death. It found two aggravating circumstances: the capital offense was committed during a robbery; and the offense was especially heinous, atrocious or cruel compared to other capital offenses. Defense counsel conceded the latter aggravating circumstance. The trial court also found two statutory mitigating circumstances: Mr. Taylor's lack of a significant history of criminal activity; and Mr. Taylor's age at the time of the offense. It found additional non-statutory mitigating circumstances for Mr. Taylor, including the love of his family and friends for him, his admission of guilt, his life and behavior prior to the commission of the crime, his good school behavior, and his prior good works.

The Alabama Court of Criminal Appeals affirmed Mr. Taylor's convictions and sentence on direct appeal, *see Taylor v. State*, 666 So. 2d 36 (Ala. Crim. App. 1994) (*Taylor I*), and the Alabama Supreme Court in turn affirmed the Court of

Criminal Appeals' decision in *Taylor II*, summarily affirming the Court of Criminal Appeals' decision as to  particular issues before us.  Mr. Taylor sought post-conviction relief, but the Alabama courts rejected his claims.  *See Taylor v. State*, 10 So. 3d 1037 (Ala. Crim. App. 2004) (*Taylor III*), *aff'd in part and rev'd in part*, 10 So. 3d 1075 (Ala. 2005), *on remand*, 10 So. 3d 1079 (Ala. Crim. App. 2006) (*Taylor IV*).  The district court later denied Mr. Taylor federal habeas corpus relief.

## II

We review the denial of a petition for a writ of habeas corpus *de novo*.  *See Owens v. McLaughlin*, 733 F.3d 320, 324 (11th Cir. 2013).  But, as explained below, our ultimate review of Mr. Taylor's claims is not plenary.

The Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996), governs Mr. Taylor's habeas corpus petition.  Because the claims presently before us were adjudicated on the merits by the Alabama Court of Criminal Appeals, Mr. Taylor can obtain relief only if that adjudication was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  A state court's findings of fact are presumed correct under AEDPA "unless rebutted by clear and convincing

5

evidence." *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (citing 28 U.S.C.  2254(e)(1)).

"A state court decision is 'contrary to' clearly established federal law when it arrives at an opposite result from the Supreme Court on a question of law, or when it arrives at a different result from the Supreme Court on 'materially indistinguishable' facts." *Owens*, 733 F.3d at 324 (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)).  Under the "unreasonable application" clause, habeas relief may be granted only if "the state court identifie[d] the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Pope v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 1254, 1262 (11th Cir. 2014) (quoting *Jones v. GDCP Warden*, 746 F.3d 1170, 1183 (11th Cir. 2014)).

"[A]n unreasonable application [of clearly established federal law] must be objectively unreasonable, not merely wrong; even clear error will not suffice. Rather, . . . a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, ___ U.S. ____, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks omitted).

## III

On appeal, Mr. Taylor argues that he is entitled to habeas relief because the State exercised its peremptory strikes against a prospective African-American juror based on his race, which denied him equal protection. Mr. Taylor also contends that the trial court's refusal to instruct the jury on the lesser-included offense of felony murder denied him due process. Finally, Mr. Taylor claims that he received ineffective assistance because his trial counsel generally failed to subject the state's case to adversarial testing and failed to investigate and present mitigating evidence. We address each of Mr. Taylor's claims below.

## A

Mr. Taylor argues that the prosecution exercised a peremptory strike against an African-American member of the venire on the basis of his race in violation of the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79 (1986), and the Equal Protection Clause of the Fourteenth Amendment. As background, during jury selection the prosecution used peremptory strikes to remove three of the five African-Americans from the venire. The remaining two African-American venire members served on Mr. Taylor's jury. After the jury was selected, but prior to

7

being sworn in, defense counsel raised a *Batson* objection, noting that the prosecutor "struck three jurors . . . of the black race." *Taylor I*, 666 So. 2d at 40.[1]

As to Jeremiah Turner, one of the three African-American venire members who had been struck, the prosecutor offered the following reason in support of his peremptory strike: "During the course of voir dire on Friday Mr. Turner, in response to questions posed both by the State and by the defense, indicated that he would not go along with the death penalty. The basis for that – Or that was the basis upon which the State struck Mr. Turner." The trial court ultimately overruled Mr. Taylor's *Batson* challenge.

On direct appeal of his conviction and sentence, Mr. Taylor claimed that the prosecution struck Mr. Turner based on his race. In reviewing the record, the Alabama Court of Criminal Appeals found that, even viewing Mr. Turner's voir dire responses in the light most favorable to the prosecution, it could not state that "those responses affirmatively support[ed] the prosecutor's reason, i.e., that this venire member 'indicated that he would not go along with the death penalty.'" *Taylor I*, 666 So. 2d at 42. It noted, however, that "at least at one point the prosecutor expressed some concern about [Mr.] Turner's willingness to impose the death penalty." *Id.* It therefore concluded that, although the prosecutor's assessment of Mr. Turner's attitude toward the death penalty may have been

---

[1] The record before us does not contain a transcript of the process by which the parties exercised their peremptory strikes.

8

wrong, "[a] prosecutor may strike from mistake[ ] as long as the assumptions involved are based on an honest belief and are racially neutral," and the record reflected as much. *Id.*

"*Batson* prohibits the use of peremptory challenges to exclude people from the petit jury based on their race, as a violation of the Equal Protection Clause of the Fourteenth Amendment." *Madison v. Commissioner, Ala. Dep't of Corr.*, 761 F.3d 1240, 1242 (11th Cir. 2014). The Supreme Court has outlined the following three-part test for evaluating whether a prosecutor's use of peremptory challenges is unconstitutional: (1) the defendant must establish a prima facie case to support an inference of purposeful discrimination; (2) if a prima facie case is established, the prosecutor must provide race-neutral reasons for the strike; and (3) the trial court then has "the duty to determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 96–98.

At issue before us is the third step, i.e., whether Mr. Taylor "has established purposeful discrimination." *Id.* at 98. "This is a pure issue of fact, subject to review under a deferential standard." *Lee v. Commissioner, Ala. Dep't of Corr.*, 726 F.3d 1172, 1199-1200 (11th Cir. 2013) (quoting *Hernandez v. New York*, 500 U.S. 352, 364 (1991) (plurality opinion)) (internal quotation marks omitted). And, as noted earlier, "[a] federal habeas court must 'presume the [state] court's factual findings to be sound unless [the petitioner] rebuts the presumption of correctness

9

by clear and convincing evidence.'" *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1251 (11th Cir. 2013) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005), and 28 U.S.C. § 2254(e)(1)).

Mr. Taylor contends that the record contradicted the prosecution's proffered race-neutral reason for striking Mr. Turner. He asserts that the Alabama Court of Criminal Appeals improperly concluded that, even though the record did not support the prosecutor's stated reason for striking Mr. Turner, the prosecutor could have made an honest mistake and did not exercise the strike on racial grounds. *See Taylor I*, 666 So. 2d at 42. Mr. Taylor further argues that the Alabama Court of Criminal Appeals ignored the fact that the prosecution did not strike non-African-American venire members who were more reluctant than Mr. Turner to impose the death penalty.

We cannot say that the Court of Criminal Appeals' conclusion was an unreasonable application of *Batson*. *See Lee*, 726 F.3d at 1226 ("The conclusion that an honestly mistaken but race-neutral reason for striking a black venire member did not violate *Batson* was not unreasonable."). Nor can we conclude that the Court of Criminal Appeals made an unreasonable determination of the facts in light of the record before it.

The determination that Mr. Taylor failed to establish purposeful discrimination on the part of the prosecution is a finding of fact, which we

"presume[ ] to be correct," § 2254(e)(1), and to which we accord great deference. *See Lee*, 726 F.3d at 1199-1200. Although we acknowledge that Mr. Taylor's argument concerning the striking of Mr. Turner is not without some force, Mr. Taylor has failed to rebut by clear and convincing evidence the presumption of correctness given to the Court of Criminal Appeals' finding that the prosecutor struck Mr. Turner based on a honestly mistaken, but race-neutral, reason. *See* § 2254(e)(1). Additionally, having reviewed the voir dire transcripts, we disagree with Mr. Taylor's contention that there were non-African American venire members who demonstrated greater reluctance than Mr. Turner towards imposing the death penalty.

**B**

Mr. Taylor also argues that the trial court's refusal to instruct the jury on the lesser-included offense of felony murder violated his right to due process. He contends that he is entitled to habeas relief because the Alabama Court of Criminal Appeals' affirmance of the trial court's denial of his request was an unreasonable application of the Supreme Court's decision in *Beck v. Alabama*, 447 U.S. 625 (1980).

In *Beck*, the Supreme Court held that "a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-

capital offense, and *when the evidence would have supported such a verdict*."  *Id.* at 627 (emphasis added).  This is so because "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to provide the jury with another option of a lesser-included offense leads to the intolerable risk of an unwarranted conviction for a capital crime."  *Roberts v. Commissioner, Ala. Dep't of Corr.*, 677 F.3d 1086, 1094 (11th Cir. 2012) (citing *Beck*, 447 U.S. at 637) (internal quotation marks omitted). Indeed, "due process *requires* that a lesser included offense instruction be given when the evidence warrants such an instruction."  *Hopper v. Evans*, 456 U.S. 605, 612 (1982) (emphasis added).

Under Alabama law, "[w]here the evidence will support a charge on the offense of capital murder, a charge on the lesser-included offense of felony murder is warranted only if a reasonable theory of the evidence indicates that the murder may not have been intentional."  *Thompson v. State*, 153 So. 3d 84, 156 (Ala. Crim. App. 2012).  The Court of Criminal Appeals rejected Mr. Taylor's *Beck* claim, ruling that Mr. Taylor was not "'simply blindly acting out,'" and that there was no rational basis for convicting him of felony murder.  *Taylor I*, 666 So. 2d at 55.  According to Mr. Taylor, however, the evidence presented at trial could have supported a jury finding of guilt on the lesser-included offense of felony murder.

Although he acknowledges that the defense conceded at trial that he beat and robbed the Moores, he notes that his counsel disputed that he intended to kill the Moores.

The state, however, presented the testimony of Sergeant Troy Higdon, who was present when Mr. Taylor gave his statement to the police. Sgt. Higdon testified that Mr. Taylor admitted "he knew that he would have to kill [the Moores], because they did know him and could identify him." Mr. Taylor points out that his signed written statement to police did not include such an admission. He also notes that, though this written statement was subsequently amended to add additional information initially left out, his alleged admission—that he knew he would have to kill the Moores—was not added then either. Mr. Taylor thus contends that a reasonable jury could have chosen to credit the written statement, which contained no mention of any intent on his part to kill the Moores, rather than Sgt. Higdon's testimony. [2]

We cannot say that the denial of Mr. Taylor's *Beck* claim in this case was an unreasonable application of Supreme Court precedent. First, "due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Hopper,* 456 U.S. at 611. Second, the Alabama Court of

---

[2] Mr. Taylor also contends that, at the hearing on his motion to suppress his statements to the police, Sgt. Higdon stated that he did not remember Mr. Taylor being asked if he intended to kill the victims. This evidence, however, was not presented at trial. Accordingly, we deal with this impeachment evidence below in the context of Mr. Taylor's guilt phase ineffective assistance of counsel claim related to the cross-examination of Sgt. Higdon.

Criminal Appeals determined that "[t]here [was] no rational basis for a verdict convicting [Mr. Taylor] of felony murder." *Taylor I*, 666 So. 2d at 54-55. We understand the state court's application of its "no rational basis" standard to be the equivalent of the federal rule—whether "the evidence would permit a jury rationally to find [Mr. Taylor] guilty of the lesser offense and acquit him of the greater." *Hopper*, 456 U.S. at 612. In concluding that a felony-murder jury instruction was not warranted, the Alabama Court of Criminal Appeals noted that Mr. Taylor went to see the Moores because he knew them and that he took with him a duffel bag containing a barbell. *Taylor I*, 666 So. 2d at 55. After being allowed into the home and talking with the couple, Mr. Taylor retrieved the barbell, which he had left outside, and he used it to brutally beat and kill Mr. and Mrs. Moore. *Id.* He then took money and checks from the Moores, and he stole their car. *Id.* Given this evidence, the Court of Criminal Appeals reasonably concluded that "[t]he victims' deaths were not 'unintended deaths caused by [the defendant's] dangerous conduct.'" *Id.* In other words, the Alabama Court of Criminal Appeals gave proper application to *Beck* principles when it effectively decided that the evidence would not permit a rational jury to find Mr. Taylor guilty of felony murder and acquit him of capital murder.

14

## C

Finally, Mr. Taylor claims that he received constitutionally ineffective assistance of counsel throughout the proceedings against him. Primarily, he asserts that trial counsel failed to investigate available mental health evidence and related mitigation. Mr. Taylor contends that this failure to investigate and present mitigation evidence, when taken together with trial counsel's concessions of guilt and failure to subject the state's presentation of key evidence to appropriate adversarial testing, resulted in the denial of his Sixth Amendment right to effective counsel.

Mr. Taylor's claims are governed by the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to establish ineffective assistance of counsel under *Strickland*, a defendant must show that his attorney's performance was deficient, and that this deficient performance prejudiced the defense. *Id.* at 687. "To establish deficient performance, a person . . . must show that counsel's representation fell below an objective standard of reasonableness." *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 688). The prejudice prong of *Strickland*, in turn, requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Because both parts of the [*Strickland*] test must be satisfied in order to show a violation of the Sixth

15

Amendment, [we] need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000). *See also Strickland*, 466 U.S. at 697.

For purposes of our discussion, we divide Mr. Taylor's ineffectiveness claims into two categories, those relating to the guilt phase of Mr. Taylor's proceedings and those relating to the penalty phase.

i

Mr. Taylor contends that his attorneys were constitutionally ineffective during the guilt phase in conceding his guilt and failing to subject the state's presentation of key evidence to appropriate adversarial testing. Mr. Taylor notes, as an example, that all throughout voir dire defense counsel conceded to the prospective jurors that Mr. Taylor was not only guilty, but "a thousand percent guilty." He also points out that, during opening and closing arguments to the jury, his counsel stated that "[t]here's nothing that mitigates the crime," "nothing that justifies this crime." Mr. Taylor further argues that trial counsel overemphasized the violent nature of the crime and dwelled on the victims' suffering.

Mr. Taylor maintains that this deficient performance continued during the trial itself when counsel failed to cross-examine a majority of the state's witnesses, including Sgt. Higdon who testified on direct examination concerning an admission by Mr. Taylor to police that he intended to kill the Moores. As

discussed earlier in our examination of his jury instruction claim, Mr. Taylor notes that this purported statement of intent was not included in his signed written statement to police, even when this statement was subsequently amended to add additional information.  Additionally, Mr. Taylor argues that Sgt. Higdon testified during a suppression hearing that he did not remember Mr. Taylor being asked during his interrogation if he intended to kill the victims.  Mr. Taylor says that counsel's failure to challenge Sgt. Higdon's testimony in this regard—indeed their overall failure to effectively challenge the state's evidence on intent—together with their excessive concessions of guilt, prejudiced him.

The Alabama Court of Criminal Appeals reviewed Mr. Taylor's guilt phase ineffectiveness claims on collateral review and concluded that Mr. Taylor was not denied the effective assistance of counsel.  *See Taylor III*, 10 So. 3d at 1058-61. We conclude that its application of *Strickland* in this instance was reasonable.

The Supreme Court has recognized that, in some capital cases, "avoiding execution [may be] the best and only realistic result possible."  *Florida v. Nixon*, 543 U.S. 175, 191 (2004) (internal quotation marks omitted).  As a result, "[c]ounsel [ ] may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared."  *Id.*  In attempting to reach such an end, "counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness

17

to engage in 'a useless charade.'" *Id.* at 192 (citing *United States v. Cronic*, 466 U.S. 648, 656-57 (1984)).

Here, as the Court of Criminal Appeals recognized, trial counsel "faced [ ] the daunting task of representing a defendant who was absent without leave from the United States Navy, who was arrested while driving the victims' stolen vehicle, who was in possession of other items taken from the victims, and who confessed to savagely beating the victims with a barbell." *Taylor III*, 10 So. 3d at 1059. At the evidentiary hearing on Mr. Taylor's ineffective assistance claim, trial counsel testified that they made the strategic decision

> to concede the graphic and gruesome nature of the crime in an attempt to lessen the impact of the State's evidence. [Trial counsel] stated that their trial strategy was to be honest with the jury in an attempt to establish credibility in order to get the jury to recommend that [Mr.] Taylor be sentenced to life imprisonment without parole.

*Id.* at 1058. Given Mr. Taylor's confession and the overwhelming evidence against him, we cannot conclude "that no competent counsel would have taken the action that this counsel [took]." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

Nor can we conclude that counsel was constitutionally ineffective in deciding not to cross-examine certain witnesses, as this was in keeping with their strategy. Although trial counsel did not cross-examine all of the state's witnesses, they did question some. And in their cross-examinations of those particular

18

witnesses, the record reflects that trial counsel chose to focus their questioning on Mr. Taylor's character and his behavior prior to the murders, eliciting testimony that was beneficial to their arguments for leniency. For example, one witness testified on cross-examination that Mr. Taylor helped him and his mother move in the days before the murders, sharing in the work and not asking for any money in return. Another witness testified on cross-examination that she went to high school with Mr. Taylor and that he was well liked. Several of the witnesses also testified on cross-examination that Mr. Taylor did not appear to be on drugs or alcohol prior to the murders. Accordingly, we conclude that counsel's performance in this regard was not deficient.

As to Mr. Taylor's argument that his attorneys rendered ineffective assistance because they did not challenge Sgt. Higdon concerning his testimony that Mr. Taylor admitted that he intended to kill the Moores, Mr. Taylor has not shown that the result of the proceeding would have been different had counsel impeached Sgt. Higdon. At trial, the following exchange occurred during Sgt. Higdon's direct examination:

> PROSECUTOR: Troy, during the course of your questioning of Mr. Taylor during the hours of the late evening of November the 8th or early morning hours of November the 9th, 1991; Mr. Taylor is not reflected here in the statement or in your supplement, but did he ever relate to you what he intended to do with regard to Mr. and Mrs. Moore when he went up there to get that car because he was tired of walking?

19

> SERGEANT HIGDON: Yes, sir, he did.
>
> PROSECUTOR: What, if anything, did he relate to you during the course of your questioning of him as far as what his intent was with regard to the Moores when he went up there with that bar bell and that duffle bag?
>
> SERGEANT HIGDON: He knew the Moores knew him, and during the questioning it was asked, "You knew they knew you, why – what did – what was you going to do?" He said he knew that he would have to kill them, because they did know him and could identify him.

When testifying earlier at a hearing on Mr. Taylor's motion to suppress, however, Sergeant Higdon had testified as follows:

> DEFENSE COUNSEL: Did you ever hear anybody or did you ever ask a question something to the effect of "Did you mean to kill them?"
>
> SERGEANT HIGDON: I don't recall. I don't think that I did. I may have, but I just don't recall it.
>
> DEFENSE COUNSEL: Did you ever hear Michael make any kind of statement to the effect that he did not mean or did not intend to kill them?
>
> SERGEANT HIGDON: No, sir.

The Alabama Court of Criminal Appeals noted that an investigator with the district attorney's office had also been a witness at the suppression hearing. *See Taylor III*, 10 So. 3d at 1060. That investigator testified, as did Sgt. Higdon at trial, that Mr. Taylor was questioned concerning "whether or not he had intended to kill Mr. and Mrs. Moore" during his interrogation, and he responded that "he had intended

20

to kill them." The investigator further described how Mr. Taylor "went in to the fact that the man moved – you know, he saw the man still moving and trying to pull up on the refrigerator and he went over and hit him again. And he was asked – I remember him being asked why. He said they knew who he was."

Accordingly, even if Sgt. Higdon's earlier failure to recall Mr. Taylor's admission could have been used by trial counsel as effective impeachment, the prosecution could simply have called the district attorney's investigator to testify at trial to the same effect. Given the investigator's testimony at the suppression hearing, there is not a reasonable probability that the guilt phase proceedings against Mr. Taylor would have been different had trial counsel cross-examined and impeached Sgt. Higdon. *See Taylor III*, 10 So. 3d at 1060.

**ii**

Mr. Taylor also contends that his attorneys were constitutionally ineffective in failing to investigate and present available mental health evidence and related mitigation during the penalty phase of the proceedings. He asserts that trial counsel possessed pre-trial reports addressing his competency and sanity that strongly suggested psychological dysfunction and disturbance at the time of the crime, and he argues that these findings were reinforced by the observations and accounts of friends and family that were reported to counsel. Mr. Taylor contends that trial counsel's failure to investigate these concerns and their failure to present

21

any evidence of his mental health as mitigation during the penalty phase constituted deficient performance on their part. He further argues that trial counsel performed deficiently in stipulating that the crime was especially heinous, atrocious and cruel, an aggravating factor under Alabama law. This deficient performance, Mr. Taylor argues, prejudiced his defense because such mitigation evidence would have weakened the state's aggravating circumstances. We conclude that the Alabama Court of Criminal Appeals reasonably determined that Mr. Taylor failed to meet his burden of proving prejudice. *See Taylor III*, 10 So. 3d at 1052-53, 1062-64.

At the Rule 32 evidentiary hearing on his ineffective assistance claim, Mr. Taylor presented the testimony of Dr. Sanford L. Drob, a clinical and forensic psychologist. As part of his forensic psychological evaluation of Mr. Taylor, Dr. Drob reviewed transcripts of the penalty phase proceedings and the results of court-ordered competency and insanity evaluations. Dr. Drob also interviewed Mr. Taylor and his family. Based on his work, Dr. Drob concluded "that, at the time of [Mr.] Taylor's trial, there was, in his opinion, evidence that he suffered from certain mental illnesses that could have been considered by the jury and the court in mitigation." *Taylor III*, 10 So. 3d at 1052. Dr. Drob described Mr. Taylor as "an extremely immature, overwhelmed youth who was experiencing a severe emotional crisis" prior to the crime. He also noted that Mr. Taylor "suffers from

certain problems in learning and thinking that would predispose him to decompensate (i.e. fall apart psychologically) under stress." In addition, Dr. Drob testified that Mr. Taylor's family members described a history of mental illness on his paternal side of the family and a history of severe alcoholism and physical abuse on his maternal side.

Dr. Drob acknowledged in his evaluation that Mr. Taylor "certainly engaged in a series of anti-social acts culminating in the homicides for which he was convicted." He concluded, however, that "the homicides themselves were committed in a state of psychological disorganization and panic, and were not the result of reasoned reflection." Dr. Drob further determined that "although these acts appear to have been planned out in advance, and [Mr. Taylor] appreciated their wrongfulness, it does not appear that they were planned with the intention of causing the death of the victims." Significantly, Dr. Drob made this determination based on the psychological testing conducted after Mr. Taylor's arrest, as well as the accounts of Mr. Taylor and his family concerning his frame of mind at the time of the offense. Dr. Drob concluded that "Mr. Taylor's attack on the victims was planned and executed in an extremely agitated, panic-filled and confused state of mind, and were, at least in part, a function of the pathological emotional and personality disturbances that [Mr. Taylor] was experiencing in the weeks and months prior to the incident."

In response, the state presented the testimony of Dr. Glen King, a clinical and forensic psychologist who had evaluated Mr. Taylor. Dr. King opined that Mr. Taylor did not suffer from a major mental disease or defect. He concluded, based on the records of the court-ordered competency and insanity evaluations he reviewed and his interview with Mr. Taylor, that "there was no evidence for any psychological disorder, psychiatric disorder that was serious, that [he thought] would rise to the level where it could be mitigat[ing]." Dr. King acknowledged that there was some indication that Mr. Taylor was engaged in unusual behavior, based on his history, in the two to three weeks leading up to the time of the murders, but he believed that this behavior was the exception when looked at in the context of Mr. Taylor's entire history. Indeed, he noted that many of the witnesses presented by the defense in mitigation during the penalty phase testified similarly. With respect to the family history discussed by Dr. Drob, Dr. King testified that he did not consider such history relevant in determining whether Mr. Taylor suffered from a psychological disorder because he found no evidence of such conditions in Mr. Taylor's nuclear family, "which is where he would have directly inherited those conditions." Dr. King acknowledged, however, that he did not interview Mr. Taylor's family members, but rather relied on interviews of family members conducted by Mr. Taylor's trial counsel, as well as information they collected, and Mr. Taylor's own statements.

24

In reviewing Mr. Taylor's penalty phase ineffective assistance of counsel claim, the Alabama Court of Criminal Appeals concluded, in part, that Mr. Taylor suffered no prejudice. *See Taylor III*, 10 So. 3d at 1052-53, 1062-64. "[E]ven assuming, arguendo, that trial counsel had found and presented a witness that would have testified at trial in the manner that [Dr.] Drob did at the evidentiary hearing, . . . there is no reasonable probability that the balance of aggravating and mitigating circumstances that led to the imposition of the death penalty in this case would have been different." *Id.* at 1052. Upon review, we find this conclusion to be objectively reasonable.

When assessing whether counsel's allegedly deficient performance at the penalty phase caused a defendant prejudice, "[w]e ask whether without the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different. The answer comes from taking the mitigating circumstances that were presented and adding to them the ones that should have been but were not, and then considering the total mitigating circumstances against all of the aggravating circumstances." *Lynch v. Sec'y, Fla. Dep't of Corrections*, 776 F.3d 1209, 1226 (11th Cir. 2015) (internal quotation marks and citations omitted).

In sentencing Mr. Taylor to death for the murders of Mr. and Mrs. Moore, the trial court found two statutory aggravating circumstances: that the murders

were committed during the course of a robbery; and that the murders were especially heinous, atrocious, or cruel. The trial court also found two statutory mitigating circumstances—Mr. Taylor's lack of a significant history of criminal activity and his age at the time of the offense—and five non-statutory mitigating circumstances. In order for Mr. Taylor to establish that he was prejudiced by trial counsel's failure to present mental health evidence such as that conveyed by Dr. Drob at the Rule 32 evidentiary hearing, Mr. Taylor would need to show that a reasonable probability exists that such evidence, when taken together with his lack of a significant criminal history and age, would have altered the balance between the aggravating and mitigating circumstances. *See Lynch*, 776 F.3d at 1227.

The Alabama Court of Criminal Appeals determined that Mr. Taylor failed to meet his burden, concluding that "in light of [Mr.] Taylor's brutal attack upon and murder of an elderly couple, [there was] no reasonable probability that the presentation of psychological evidence such as that presented at [Mr.] Taylor's evidentiary hearing would have changed the jury's recommendation [or] altered [the court's] findings that the aggravating circumstances outweighed the mitigating circumstances." *Taylor III*, 10 So. 3d at 1053. In reaching this conclusion, the Alabama Court of Criminal Appeals cited to our prior decision in *Grayson v. Thompson*, 257 F.3d 1194 (11th Cir. 2001), which involved somewhat similar facts.

In *Grayson*, the petitioner raped, beat, and brutally murdered an elderly widow while burglarizing her home, and was convicted of capital murder during the burglary of an inhabited dwelling. *Id.* at 1197-1208. The trial court found two aggravating circumstances: the murder was committed during the commission of a rape, robbery, and burglary; and the murder was especially heinous, atrocious, and cruel, especially when compared to other capital felonies. *Id.* at 1207-09. The trial court found several mitigating circumstances, including, among other things, that the petitioner did not have a long history of prior criminal involvement and that he was nineteen years old at the time of the offense. *Id.* In his federal habeas proceeding, the petitioner argued that his trial counsel was ineffective at the sentencing phase in failing to gather and present evidence regarding, among other things, the petitioner's impoverished and dysfunctional family background and his history of alcoholism and intoxication at the time of the offense. *Id.* at 1224.

We concluded in *Grayson* that, given the brutal nature of the crime against an elderly victim, there was no reasonable probability that the balance of aggravating and mitigating circumstances would have been different had counsel introduced the evidence compiled and presented in the petitioner's state habeas proceedings. *Id.* at 1225-31. We reached this conclusion, in part, because we determined that none of the evidence developed in connection with the state habeas proceedings served to alter in any way the aggravating circumstance of a heinous

27

and atrocious crime that supported the imposition of the death penalty. *Id.* at 1226-27.

The Alabama Court of Criminal Appeals similarly concluded that, given the powerful strength of the aggravating circumstances surrounding Mr. Taylor's brutal attack and murder of the elderly Moores, there was not a reasonable probability that the proposed mitigation evidence would have been strong enough to outweigh them. *See Taylor III*, 10 So. 3d at 1053. Particularly given the competing testimony of Dr. King, we find that reasonable jurists could conclude, as the Court of Criminal Appeals did here, that the strong aggravating circumstances would still have outweighed all of the mitigating circumstances. *See generally Sears v. Upton*, 561 U.S. 945, 954 (2010) ("[W]e have explained that there is no prejudice when the new mitigating evidence would barely have altered the sentencing profile presented to the decisionmaker.") (internal quotation marks omitted).

## IV

Based on the foregoing, we affirm the district court's denial of Mr. Taylor's petition for writ of habeas corpus.

**AFFIRMED.**