# Supreme Court of Florida

_____

No. SC17-2235
_____

**RICHARD E. LYNCH,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

September 20, 2018

PER CURIAM.

This case is before the Court on appeal from an order denying a motion to

vacate two sentences of death under Florida Rule of Criminal Procedure 3.851.

Because the order concerns postconviction relief from two sentences of death, this

Court has jurisdiction under article V, section 3(b)(1) of the Florida Constitution.

## FACTS AND BACKGROUND

Richard E. Lynch pled guilty to two counts of first-degree premeditated

murder, one count of armed burglary of a dwelling, and one count of kidnapping,

all of which stemmed from events that occurred on March 5, 1999, and resulted in

the deaths of Roseanna Morgan and her thirteen-year-old daughter, Leah Caday.

*Lynch v. State* (*Lynch I*), 841 So. 2d 362, 365-66 (Fla. 2003). The United States

Court of Appeals for the Eleventh Circuit most concisely detailed the facts

surrounding the murders:

> Lynch murdered Morgan and Caday on March 5, 1999, because
> he could not accept Morgan's decision to end their extramarital affair.
> *See Lynch* [*I*, 841 So. 2d at 366]. The affair had lasted from August
> 1998 until February 1999. *Id.* While it was underway, although
> Lynch was unemployed and relied on his wife for financial support,
> he obtained three credit cards that were used to make more than
> $6,000 worth of purchases for Morgan. *See Lynch v. State* [(*Lynch
> II*)], 2 So. 3d 47, 66 (Fla. 2008). She ended the affair on February 9,
> 1999 after her husband returned from Saudi Arabia where he had been
> working as a military contractor. *See Lynch* [*I*], 841 So. 2d at 374.
> While Morgan moved on, Lynch did not. He began stalking Morgan,
> hanging around her apartment complex, showing up at her job,
> following her on her way home from work, and calling her apartment.
> Morgan's husband confronted Lynch several times and told him to
> leave her alone, but it did no good. Lynch persisted.
>       On March 3, 1999, about three weeks after Morgan had ended
> the affair, Lynch wrote a letter to his wife declaring his intention to
> kill Morgan and then himself. *See id.* at 366, 368. In that letter he
> asked his wife to send Morgan's parents copies of the letters and cards
> Morgan had written to him, as well as nude pictures of Morgan that he
> had taken. *Id.* at 366. He wrote that "I want them to have a sense of
> why it happened, some decent closure, a reason and
> understanding. . . . I want them to know what she did, the pain she
> caused, that it was not just a random act of violence." *Lynch* [*II*], 2
> So. 3d at 64 (emphasis omitted). Lynch went on in the letter about the
> debts that had been run up on the credit cards, his fear that Morgan
> would not pay him back for any of the purchases, and the pain that she
> had caused him by ending their affair. After describing in explicit and
> unnecessary detail the various sexual acts he and Morgan had engaged
> in and how much he had enjoyed them, on the last page of the letter
> Lynch apologized to his wife "for all the pain, suffering, expense,
> embarrassment and hardship I will cause and give to you," but
> concluded that Morgan "must pay the price." Lynch left the letter in
> his garage.

Two days later, on March 5, he packed three pistols and ammunition into a black bag and drove to Morgan's apartment. *See id.* at 59. He parked his car down the street and around the corner from the apartment complex so that Morgan and her daughter Caday would not see it when they arrived at the complex. *Id.*; *Lynch* [*I*], 841 So. 2d at 367 n.3. Lynch grabbed the bag with the three pistols and ammunition from the trunk of his car, walked to the complex, and picked an inconspicuous spot to wait for Morgan to return. *See Lynch* [*II*], 2 So. 3d at 76.

Caday got home first. *See id.* Lynch talked the thirteen-year-old into letting him inside by telling her that he wanted to speak with her mother. *See id.* at 62. Once inside the apartment, he pulled one of the pistols from the black bag and held Caday at gunpoint for thirty or forty minutes while waiting for Morgan to arrive. *See Lynch* [*I*], 841 So. 2d at 366. All the while, the young girl was "terrified." *Id.* She asked Lynch "why he was doing this to her." *Id.*

When Morgan finally returned home, Lynch met her at the door with a pistol in his hand. *See Lynch* [*II*], 2 So. 3d at 59. Sensing what Lynch was going to do, Morgan refused to come inside. They had a heated discussion, which ended when Lynch fired seven shots. *See id.* at 58, 70. Three of the shots hit Morgan in the legs. *See id.* at 53, 69-70. One hit her eye and tore through her neck. *See id.* at 69-70. She fell to the floor in the hallway outside her apartment, bleeding and screaming for help. *See Lynch* [*I*], 841 So. 2d at 366, 371. Lynch walked outside the apartment into the hallway where Morgan lay, and the door closed behind him. He dragged Morgan's bleeding body by her wrist back to the door, where he knocked and told Morgan's daughter to "Hurry up, open the door, your mom is hurt." *Id.* at 367. When Caday opened the door, Lynch dragged her mother inside, closing the door behind him. *Id.*

Inside the apartment, Lynch pulled a second pistol from his bag, and several minutes after he had first shot Morgan he killed her in front of her daughter by firing a single, execution-style shot to her head. *See id.* at 370-73; *Lynch* [*II*], 2 So. 3d at 69. He then called his wife at their home, *Lynch* [*I*], 841 So. 2d at 366, and told her he was "sorry for what I'm going to do." During that phone call, Lynch's wife could hear Caday screaming hysterically in the background. *See id.* at 369. After Lynch hung up, he killed the young girl by shooting her in the back. *See id.* at 366.

Lynch then called his wife again. *Id.* He told her that he had accidentally shot Caday and told her that he had left a letter in the garage. *See id.* When that call ended, Mrs. Lynch dialed 911. She told the operator about Lynch's phone calls and asked for the police to investigate. She then began to look for the letter. Her sister Juliette, whom Mrs. Lynch had paged after Lynch's first phone call, arrived at the home and joined in the search. Mrs. Lynch found the letter and started to read it but was interrupted when her husband called a third time. Both she and Juliette talked to him, begging him not to kill himself. *See id.* While Juliette was speaking with Lynch, Mrs. Lynch used her cell phone to call 911 again. She told the operator about the murder-suicide letter she had just found and that Lynch was willing to turn himself in. After that 911 call ended and Lynch had ended his call to Mrs. Lynch, she returned to reading the letter he had left. Before she could finish reading it, several police officers arrived at her home. *See Lynch* [*II*], 2 So. 3d at 68. One officer, after confirming that she was Mrs. Lynch, asked her for the letter. *See id.* She did not want to hand it over until she had finished reading it, but the officer kept asking and she gave him the letter.

While Mrs. Lynch was talking with the officers, Lynch himself called 911. *See Lynch* [*I*], 841 So. 2d at 370. He talked with the 911 operator for the next thirty or forty minutes. *See Lynch* [*II*], 2 So. 3d at 57-58. By the time that call began, two officers were at Morgan's apartment responding to the neighbors' reports of shots fired. The officers attempted to enter the apartment, but quickly retreated when Lynch fired a shot at them. *See Lynch* [*I*], 841 So. 2d at 366. Eventually, the SWAT team arrived, there were negotiations, and Lynch gave himself up. Before he did that, Lynch told the 911 operator that he had killed two people, that he had shot Morgan to "put her out of her misery," and that he had fired at the two police officers who tried to enter the apartment. *Id.*

*Lynch v. Sec'y, Fla. Dep't of Corrs.* (*Lynch IV*), 776 F.3d 1209, 1212-14 (11th Cir. 2015). Lynch's trial counsel, in considering the abundance of evidence available against Lynch, recommended that he waive a penalty phase jury because a jury would be more emotional and unsympathetic to mitigation presented for the

murder of a child than a seasoned trial judge would be. *Id.* at 1214. Accordingly,

Lynch waived his right to a penalty phase jury. *Id.* at 1215.[1]

The testimony elicited during the penalty phase regarding the events of March 5, 1999, included a tape of a telephone call that appellant made to the "911" emergency assistance service while still in the apartment where the murders occurred. On that tape, Lynch is heard admitting to the 911 operator that he shot two people at 534 Rosecliff Circle. He said he initially traveled to the apartment only to attempt to have Morgan pay a credit card debt, but resorted to shooting her in the leg and in the back of the head. He told the 911 operator that he had three handguns with him and that he shot Morgan in the back of the head to "put her out of her misery." Appellant also admitted to firing at the police when they first arrived on the scene.

As to Caday, appellant informed the 911 operator that he had held Caday at gunpoint while waiting for Morgan to return home. He related that she was terrified during the process prior to the shootings and asked him why he was doing this to her. Appellant admitted that he shot Caday, and said "the gun just went off into her back and she's slumped over. And she was still breathing for awhile and that's it." Appellant told the operator he planned to kill himself.

During the course of these events on March 5, 1999, appellant telephoned his wife three times from the apartment. His wife testified that during the first call she could hear a woman screaming in the background. Appellant's wife further testified that the screaming woman sounded "very, very upset." When Lynch called a second time, he admitted to having just shot someone.

Prior to being escorted from the apartment by police, Lynch also talked to a police negotiator. The negotiator testified that Lynch told her that during the thirty to forty minutes he held Caday hostage prior to the shootings, Caday was terrified, he displayed the handgun to her, she was aware of the weapon, and appeared to be frightened. He confided in the negotiator that Caday had complied with his requests only out of fear. Finally, appellant described the events

---

1. The State objected to Lynch's waiver of a penalty phase jury. The trial court conducted a colloquy of Lynch and ultimately accepted the waiver. Lynch also signed a written waiver.

leading to Morgan's death by admitting that he had confronted her at the door to the apartment, shot her in the leg, pulled her into the apartment, and then shot her again in the back of the head.

Several of Morgan's neighbors in the apartment complex also testified as to the events of March 5, 1999. Morgan's neighbor across the hall[n.2] testified that she looked out of the peephole in her door after hearing the initial shots and saw Lynch dragging Morgan by the hands into Morgan's apartment. She further testified that Lynch knocked on the door to Morgan's apartment and said, "Hurry up, open the door, your mom is hurt." The neighbor testified that Morgan was screaming and was bloody from her waist down. Morgan's neighbor further testified that the door was opened, then after entering with Morgan, Lynch closed the door and approximately five minutes later she heard the sound of three more gunshots. A second neighbor in the apartment complex also testified that approximately five to seven minutes after she heard the initial gunshots, she heard three more.

> [n.2] The neighbor lived in the apartment directly across the hall from Morgan's apartment in the same apartment building.

After his arrest, appellant participated in an interview with police in which he confessed to the murders. He again admitted the events of the day, telling police he showed Caday the gun and that she was very scared while they were waiting for Morgan to arrive home. He told the detective that Caday was afraid and that he was "technically" holding her hostage. He admitted to shooting Caday's mother, Morgan, four or five times in the presence of her daughter. In his post-arrest interview, Lynch also admitted that he planned to show Morgan the guns he brought with him to let her know he possessed them, and to force her to sit down and be quiet. He told the detectives he did not know why he did not just leave the guns in his car.[n.3] He admitted shooting Morgan four or five times, dragging her into the apartment, and then shooting her in the back of the head with a different firearm.

> [n.3] The detective conducting the interview with appellant testified that Lynch's car was parked down the street, around the corner, and away from Morgan's apartment. It could not be seen from the apartment.

The State's final witness was the medical examiner who testified that after receiving the gunshot wound, it probably would have taken "no more than several minutes" for Caday to die. On cross-examination, although he conceded that it was possible that Caday could have died in less than one minute from the wound, such was unlikely. Finally, he also testified that with the amount of blood loss suffered by Caday, she could have lost consciousness within ten to twenty seconds.

The defense presented only one witness, a mental health expert. She related that she had diagnosed Lynch with schizoaffective disorder, a condition which is a combination of schizophrenia and a mood disorder. Further, she testified that she did not believe the letter appellant wrote two days prior to the murders demonstrated an intent by Lynch to kill Morgan. She concluded that appellant was under the influence of an extreme mental and emotional disturbance on March 5, 1999, and that his psychotic process substantially impaired his capacity to conform his conduct with the requirements of the law.

The State attempted to rebut the defense mental health evidence through the testimony of another mental health expert. The State's expert opined that Lynch suffered from a depressive disorder. The State's expert admitted that it was his opinion that on the day of the incident, appellant was suffering emotional distress, but it was not extreme, and Lynch did not lack the ability to conform his conduct to the requirements of the law. Finally, the State's doctor opined that the letter appellant wrote prior to the murders evidenced a murder-suicide plot.

*Lynch I*, 841 So. 2d at 366-68. After considering all the evidence presented at the

penalty phase, the trial court sentenced Lynch to death for the murders of Morgan

and Caday. *Lynch IV*, 776 F.3d at 1215.[2]

_____

2. As we stated in *Lynch II*:

In imposing death sentences for the murders, the trial court found three aggravating factors as to the murder of Morgan: (1) the murder was cold, calculated and premeditated (CCP) (great weight);

(2) Lynch had previously been convicted of a prior violent felony (the murder of Caday) (moderate weight); and (3) the murder was committed while Lynch was engaged in one or more other felonies (little weight). *See* [*Lynch I*, 841 So. 2d at 368.] As to the murder of Caday, the trial court also found three aggravating factors: (1) the murder was heinous, atrocious, or cruel (HAC) (great weight); (2) Lynch had previously been convicted of a prior violent felony (the murder of Morgan) (great weight); and (3) the murder was committed while Lynch was engaged in one or more other felonies (moderate weight). *See id.* With regard to mitigation, the trial judge found one statutory mitigator and eight nonstatutory mitigators:

> The statutory mitigating factor found was that Lynch had no significant history of prior criminal activity (moderate weight). The eight nonstatutory mitigators were: (1) the crime was committed while defendant was under the influence of a mental or emotional disturbance [*but the disturbance was not extreme*] (moderate weight); (2) the defendant's capacity to conform his conduct to the requirements of law was impaired [*but not severely impaired*] (moderate weight); (3) the defendant suffered from a mental illness at the time of the offense (little weight); (4) the defendant was emotionally and physically abused as a child (little weight); (5) the defendant had a history of alcohol abuse (little weight); (6) the defendant had adjusted well to incarceration (little weight); (7) the defendant cooperated with police (moderate weight); (8) the defendant's expression of remorse, the fact that he has been a good father to his children, and his intent to maintain his relationship with his children (little weight).

> *Id.* at 368 n.5.

*Lynch II*, 2 So. 3d at 53-54 (second and third alterations in original) (footnote omitted).

On direct appeal, we affirmed the judgments and sentences under review. *Lynch I*, 841 So. 2d at 365. On October 6, 2003, the United States Supreme Court denied Lynch's petition for writ of certiorari. *Lynch v. Florida*, 540 U.S. 867 (2003). Thus, Lynch's sentence became final on that date.

We affirmed the denial of Lynch's initial motion for postconviction relief and denied his petition for writ of habeas corpus. *Lynch II*, 2 So. 3d at 86. Additionally, Lynch sought federal relief pursuant to a writ of habeas corpus, which was granted in part and denied in part. *Lynch v. Sec'y, Dep't of Corrs.* (*Lynch III*), 897 F. Supp. 2d 1277, 1286 (M.D. Fla. 2012). On appeal and cross-appeal, the Eleventh Circuit affirmed the part of the district court's judgment denying Lynch habeas relief and reversed the part of the district court's judgment granting him relief. *Lynch IV*, 776 F.3d at 1232. On January 11, 2016, the Supreme Court denied Lynch's petition for writ of certiorari to the Eleventh Circuit. *Lynch v. Jones*, 136 S. Ct. 798 (2016).

Lynch now files a successive motion for postconviction relief, challenging the constitutionality of his convictions and sentences under *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), which the postconviction court below denied. This appeal follows.

**ANALYSIS**

On his successive motion for postconviction relief, Lynch asserts that he is entitled to *Hurst* relief due to (1) his invalid waiver of his penalty phase jury, and (2) the alleged changed analysis of the prejudice prong under *Strickland v. Washington*,[3] in light of *Hurst*. As explained at length below, we find both of these arguments to be meritless and thus affirm the postconviction court's denial of relief.

**I.**

Lynch first argues that he should be entitled to relief under *Hurst* because trial counsel's deficient advice with regard to the evidence available to defend his penalty phase case resulted in an invalid waiver of his right to a penalty phase jury. We conclude that this claim is meritless based on Lynch's valid waiver of his right to a penalty phase jury and on our precedent in *Mullens v. State*, 197 So. 3d 16 (Fla. 2016), concerning such waivers.

When Lynch requested to waive his penalty phase jury, the trial court conducted an extensive colloquy with Lynch with regard to his understanding of the rights he sought to waive:

> THE COURT: . . . Now the second thing that you have done is you have asked me to consider waiving a jury trial for the penalty phase of this proceeding. Do you understand that?

---

3. *Strickland v. Washington*, 466 U.S. 668 (1984).

MR. LYNCH:  Yes.

THE COURT:  Is that what you want to do?

MR. LYNCH:  Yes, Your Honor.

THE COURT:  I need to advise you that you have the right to have a jury of twelve persons hear matters of aggravation which are limited by statute, and any matters in mitigation that you wish to present.  You have the right to be represented by a lawyer during the course of that hearing.  You're entitled to testify at the hearing or to remain silent, and your silence cannot be used against you.  You have the right to the subpoena power of the Court to compel the attendance of any witnesses that you may wish to call in your behalf at the hearing.  If the jury by a vote of at least six to six recommends that you be given a life sentence, I will not override that decision and will impose a life sentence upon you.  Do you understand that?

MR. LYNCH:  Yes, Your Honor.

THE COURT:  On the other hand, if the jury should return by a vote of at least seven to five and recommend that you be sentenced to death, I would have to give that recommendation, quote, great weight, end quote, although the final decision on the penalty to be imposed is my responsibility alone; do you understand that?

MR. LYNCH:  Yes, Your Honor.

THE COURT:  Is that what you want to do, you want to waive the right to have a jury trial as far as the recommendation of the penalty is concerned?

MR. LYNCH:  Yes, sir.

THE COURT:  You're sure about that?

MR. LYNCH:  Yes, sir.

THE COURT: You understand that if I allow you to do that, I'm not going to let you change your mind later?

MR. LYNCH: Yes.

THE COURT: All right. Does the State wish to be heard on that issue.

[THE STATE]: I do, Your Honor.
We understand, of course, it's completely discretionary with the Court at this point as to whether or not you will impanel a jury for its recommendation or not. The State's position is that this particular strategy has been employed a number of times by the Public Defender's office in this circuit. The track record so far is in every case it has been a successful strategy to avoid the imposition of the death penalty.
This case will hopefully stand on its own merits and its own facts with the Court, and surely we recognize that, but I think on behalf of the State and in light of what has happened in the past cases, the State would ask that the Court impanel a jury. And we would state to the Court that the reason for our factual basis, which is six pages long, was to give the Court a bigger picture of what's involved in this case. This is a double homicide, it is a serious death penalty case. If anyone had any question about the prior ones, I would hope that none would be entertained about this case involving the death of a thirteen year old child.
So we would ask that the Court impanel a jury and allow a jury of Mr. Lynch's peers to make a recommendation to the Court for its consideration, and that would be our preference. Obviously, it's the Court's discretion.

THE COURT: All right. Well, I'm going to allow him to waive the jury, if that's what he wants to do, and it is. So I'll grant his motion.

In addition to the oral colloquy, Lynch also signed a written waiver, which detailed

his understanding of his rights and his waiver of those rights:

E} I understand that under Florida Law I have a right to have a jury empaneled to consider matters relevant to my sentence and to have that jury recommend to the Judge, by an advisory verdict, Life Imprisonment Without Parole or the Death Penalty as to Counts 1 and Count [sic] 2 or either of them.

F} I further acknowledge I understand that, with the Court's consent, I may waive the Advisory Sentencing Jury and request that the Judge conduct the sentencing trial without a jury.
I specifically request a Sentencing Trial Without a Jury before the Judge alone and waive my right to an Advisory Jury Sentencing recommendation. *See State vs. Hernandez, 645 So. 2d 432 (Fla. 1994).*

I understand by entering these pleas of guilty that I am submitting myself to the jurisdiction of the Court and that I will not be allowed to withdraw my pleas and the judge is required to sentence me to either Life in Prison Without Parole or the Death Penalty as authorized by law, for the offenses to which I have pled guilty.

Thus, as evidenced by both the oral and written waiver, Lynch was fully advised of his right to a penalty phase jury, and the postconviction court properly found that Lynch knowingly and voluntarily waived that right. *See Tucker v. State*, 559 So. 2d 218, 220 (Fla. 1990) (holding that best practice is to obtain "both a personal on-the-record waiver and a written waiver").

Lynch, however, now attempts to obtain relief under this claim based upon the fact that trial counsel's insufficient mental health mitigation investigation ultimately caused him to make an unknowing and unintelligent waiver of his right to a penalty phase jury. We previously detailed the insufficient mental health mitigation at issue:

- 13 -

Lynch's trial counsel originally retained Dr. David Cox, a neuropsychologist. Dr. Cox concluded that Lynch suffered from cognitive disorder NOS (not otherwise specified) and a possible paranoid personality disorder. Dr. Cox recommended further neuropsychological testing to determine the degree of Lynch's impairment. Trial counsel were not pleased with the style of this expert's report, which they felt (1) was "amateurish" and (2) did not properly connect the diagnosis to the events of March 5, 1999. Trial counsel later dismissed Dr. Cox in favor of another neuropsychologist, Dr. Jacquelyn Olander. Trial counsel did not inform Dr. Olander that Dr. Cox had previously diagnosed some level of cognitive impairment. However, trial counsel did inform Dr. Olander that they had previously retained Dr. Cox. Dr. Olander respected Dr. Cox, and she assumed that if Lynch suffered from a cognitive impairment, it would have already been discovered and reported by the previous expert. Dr. Olander also assumed that trial counsel would have informed her if Lynch had received an impairment diagnosis. Based on these assumptions, Dr. Olander did not conduct neuropsychological testing with Lynch, but rather conducted only psychological testing. Dr. Olander diagnosed Lynch with schizoaffective disorder, which is a combination of schizophrenic symptoms and a mood disorder. She specifically testified at trial that Lynch did not have any brain impairment. Consequently, in sentencing Lynch, the trial court was unaware of the fact that Lynch suffered from some level of cognitive impairment.

During the postconviction hearing, [trial counsel] Mr. Figgatt and Mr. Caudill conceded that they were aware that Dr. Cox had diagnosed Lynch with a cognitive impairment. Further, they admitted that they did not follow up on this diagnosis, did not inform Dr. Olander, and did not obtain Lynch's school records or other background information to corroborate that Lynch suffered from some level of cognitive impairment. Lynch's school records might have been helpful in this regard because they reflect a disparity between his verbal and mathematic abilities (verbal exercises are predominately left-brain tasks, whereas math exercises are predominately right-brain tasks). Thus, Lynch's relatively good grades in English and religion, as compared to his low grades in mathematics courses and mechanical drawing, could have assisted his mental-health experts in diagnosing and attempting to corroborate a developmental cognitive impairment. Relatedly, Lynch's standardized test scores also reflect a disparity.

- 14 -

*Lynch II*, 2 So. 3d at 74. It is this subsequent discovery of "*mild*" cognitive impairment, *id.* at 73, Lynch asserts, that now renders his waiver of his penalty phase jury unknowing and unintelligent.

Lynch's argument, however, has one fatal flaw. The evidence Lynch's lawyers did or did not present has no bearing on the knowing and intelligent nature of the waiver of his right to a penalty phase jury. Lynch was advised on the record of his right to a penalty phase jury and the consequences of waiving that right and further attested to his informed waiver in writing. Whether the mitigation investigated and presented, upon waiver of the penalty phase jury, was sufficient is something more appropriately presented under an ineffective assistance of counsel claim. *See McMann v. Richardson*, 397 U.S. 759, 774 (1970) ("It is no denigration of the right to trial to hold that when the defendant waives his state court remedies and admits his guilt, he does so under the law then existing; further, he assumes the risk of ordinary error in either his or his attorney's assessment of the law and facts. Although he might have pleaded differently had later decided cases then been the law, he is bound by his plea and his conviction unless he can allege and prove serious derelictions on the part of counsel sufficient to show that his plea was not, after all, a knowing and intelligent act."). This Court, however, extensively analyzed whether Lynch's trial counsel were ineffective for failing to adequately investigate the mild cognitive impairment in his initial postconviction motion.

- 15 -

*Lynch II*, 2 So. 3d at 70-77. As discussed in more detail below, we held that, while counsel may have been deficient, Lynch had failed to prove that this deficiency prejudiced him—thus failing the *Strickland* test. *Id.* at 70-71, 77. Absent a showing that trial counsel was ineffective, Lynch cannot show his waiver of his penalty phase jury was unknowing or unintelligent. Therefore, the postconviction court properly held that Lynch's waiver was knowing and voluntary.

In *Mullens*, we held that when a defendant knowingly and voluntarily waives the right to a penalty phase jury, he is not later entitled to relief under *Hurst v. Florida*, 136 S. Ct. 616 (2016). *Mullens*, 197 So. 3d at 39-40.

> If a defendant remains free to waive his or her right to a jury trial, even if such a waiver under the previous law of a different jurisdiction automatically imposed judicial factfinding and sentencing, we fail to see how Mullens, *who was entitled to present mitigating evidence to a jury as a matter of Florida law even after he pleaded guilty and validly waived that right,* can claim error. As our sister courts have recognized, accepting such an argument would encourage capital defendants to abuse the judicial process by waiving the right to jury sentencing and claiming reversible error upon a judicial sentence of death. This we refuse to permit. Accordingly, Mullens cannot subvert the right to jury factfinding by waiving that right and then suggesting that a subsequent development in the law has fundamentally undermined his sentence.

*Id.* (citation omitted). Furthermore, since issuing our decision in *Mullens*, we have repeatedly reaffirmed the principle that a defendant who knowingly and voluntarily waives his right to a penalty phase jury cannot later claim relief under *Hurst* and its progeny. *Hutchinson v. State*, 243 So. 3d 880, 883 (Fla. 2018); *Rodgers v. State*,

- 16 -

242 So. 3d 276, 276-77 (Fla. 2018); *Allred v. State*, 230 So. 3d 412, 413 (Fla. 2017); *Deassure v. State*, 230 So. 3d 411, 412 (Fla. 2017); *Twilegar v. State*, 228 So. 3d 550, 551 (Fla. 2017); *Covington v. State*, 228 So. 3d 49, 69 (Fla. 2017); *Wright v. State*, 213 So. 3d 881, 903 (Fla.), *vacated on other grounds*, 138 S. Ct. 360 (2017); *Knight v. State*, 211 So. 3d 1, 5 (Fla. 2016); *Robertson v. State*, No. SC16-1297, 2016 WL 7043020, at *1 (Fla. Dec. 1, 2016); *Davis v. State*, 207 So. 3d 177, 212 (Fla. 2016); *Brant v. State*, 197 So. 3d 1051, 1079 (Fla. 2016). Based on our clear and repeated precedent, Lynch is not entitled to *Hurst* relief in light of his valid waiver of a penalty phase jury. Therefore, we affirm the postconviction court's denial of relief on this claim of Lynch's successive motion for postconviction relief.

## II.

Next, Lynch asserts that the test for the prejudice prong under *Strickland* has changed post-*Hurst*. Thus, Lynch requests that his prior claim of ineffective assistance of counsel be reevaluated with regard to the prejudice prong, in light of the allegedly modified post-*Hurst Strickland* test. Although the concur in result opinion takes the position that Lynch's *Strickland* argument should not be addressed, we disagree. The altered post-*Hurst Strickland* argument was a major component of Lynch's successive postconviction motion and we would be remiss to ignore it. The *Strickland* analysis, however, remains unchanged post-*Hurst* and,

- 17 -

therefore, we conclude that this claim of Lynch's successive postconviction motion is without merit.

In *Lynch II*, we extensively addressed the issue of whether Lynch's counsel were ineffective for failing to fully investigate his mental health mitigation evidence before advising him to waive his penalty phase jury. 2 So. 3d at 70-77. Specifically, we noted that, while counsel may have been deficient for failing to fully investigate Lynch's "*mild*" cognitive impairment, their deficiency did not prejudice Lynch because he "failed to present any evidence connecting any cognitive condition to his behavior" on the day of the murders. *Id.* at 77. Thus, even if counsel had presented evidence of Lynch's mild cognitive impairment, the significant aggravation in this case would have nonetheless outweighed the mitigation. *Id.* at 70-71. Because this Court previously extensively analyzed the issue of trial counsel's ineffectiveness, Lynch's present claim is procedurally barred. *See Hendrix v. State*, 136 So. 3d 1122, 1125 (Fla. 2014) ("Claims raised and rejected in prior postconviction proceedings are procedurally barred from being relitigated in a successive motion." (citing *Van Poyck v. State*, 116 So. 3d 347, 362 (Fla. 2013))); *see also Reed v. State*, 116 So. 3d 260, 268 (Fla. 2013); *Grossman v. State*, 29 So. 3d 1034, 1042 (Fla. 2010). Lynch cannot now resurrect a previously extinguished claim under the guise of a new *Strickland* prejudice analysis in the post-*Hurst* legal landscape.

Nevertheless, Lynch's claim also fails on the merits. We have repeatedly held that trial counsel is not required to anticipate changes in the law in order to provide effective legal representation. *See, e.g.*, *Lebron v. State*, 135 So. 3d 1040, 1054 (Fla. 2014) ("This Court has 'consistently held that trial counsel cannot be held ineffective for failing to anticipate changes in the law . . . .' " (quoting *Cherry v. State*, 781 So. 3d 1053 (Fla. 2000))). Furthermore, under *Strickland*, claims of ineffective assistance of counsel are assessed under the law in effect *at the time of the trial*. 466 U.S. at 690. Therefore, Lynch is not entitled to a different prejudice analysis today, simply due to the release of *Hurst* and its progeny. As we previously explained, Lynch's trial counsel may have rendered deficient performance, but that deficiency did not ultimately prejudice Lynch. Thus, we affirm the denial of this claim of Lynch's successive postconviction motion.

## CONCLUSION

Accordingly, we affirm the postconviction court's denial of Lynch's successive motion for postconviction relief.

It is so ordered.

CANADY, C.J., and LEWIS, POLSTON, LABARGA, and LAWSON, JJ., concur.
PARIENTE, J., concurs in result with an opinion, in which QUINCE, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

- 19 -

PARIENTE, J., concurring in result.

Pursuant to this Court's opinion in *Mullens*,[4] I agree with the per curiam opinion's conclusion that *Hurst*[5] does not apply to Lynch's case because he waived his right to a penalty phase jury. *See* per curiam op. at 16-17. However, because *Hurst* does not apply to Lynch's case, I would not address Lynch's second claim regarding the effect, if any, that *Hurst* has on the analysis of *Strickland v. Washington*, 466 U.S. 668 (1984), claims. *See* per curiam op. at 17-19. Thus, I concur in result.

QUINCE, J., concurs.

An Appeal from the Circuit Court in and for Seminole County,
   Debra S. Nelson, Judge - Case No. 591999CF000881A000XX

Maria DeLiberato, Capital Collateral Regional Counsel, Lisa Marie Bort, Maria Christine Perinetti, and Raheela Ahmed, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

   for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Donna M. Perry, Assistant Attorney General, West Palm Beach, Florida,

   for Appellee

---

4. *Mullens v. State*, 197 So. 3d 16 (Fla. 2016), *cert. denied*, 137 S. Ct. 672 (2017).

5. *Hurst v. State* (*Hurst*), 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017); *see Hurst v. Florida*, 136 S. Ct. 616 (2016).